SAMUEL D. LODGE, administrator of Rachel R. Hulings,

v.

ELMER J. HULINGS, executor, &c., et al.

[Filed April 16th, 1902.]

1. An agreement between a holder of notes and the heirs of the deceased maker (grandsons of the holder) that the heirs would pay interest on the principal during the life of the holder, in consideration that. the holder would surrender her claim to the principal and deliver the notes to the heirs to be destroyed, is founded on both a valuable and a good consideration, and is binding on the holder's administrator when fully executed on the part of the holder by the delivery and destruction of the notes.

2. In a suit by an administrator to reinstate and re-establish notes held by his intestate (which had been surrendered and destroyed pursuant to such an agreement), on the ground that the agreement was void for want of mental capacity of the holder, evidence considered and held to show that the holder was mentally competent to make the agreement.

3. In the suit by the administrator to reinstate and re-establish the destroyed notes formerly held by his intestate, but surrendered and destroyed by her direction pursuant to such an agreement, it appeared that for about two years before the making of the agreement one of the grandsons and the holder had lived in the same house, but in separate apartments. The holder of the notes had her own household and servant, and managed her own housekeeping separate and apart from that of the grandson. Another grandson lived a few hundred yards away. They were on friendly terms. The holder of the notes was badly crippled, and in feeble physical health, but there was nothing to show that she depended upon the grandsons for advice or service.—*Held*, the evidence does not establish that a confidential relation existed between her and the grandsons, so as to call upon the latter to show affirmatively that no undue influence was exercised to procure the agreement for the surrender and destruction of the notes.

4. The evidence in this case considered and held to be insufficient to show that at the time she delivered the notes to be destroyed the holder was either mentally incapable, or that she was acting under undue influence.

On bill, answer and proofs.

*Mr. Austin H. Swackhamer,* for the complainant.

*Mr. Joseph J. Summerill,* for the defendants.

Lodge v. Hulings.

GREY, V. C. (orally).

The bill in this case is filed by Samuel D. Lodge, as administrator with the will annexed of Rachel R. Hulings, against Elmer J. Hulings and John T. Ogden, executors of the last will and testament of Paschal L. Hulings, deceased, and against Andrew B. Hulings and Elmer J. Hulings apparently in their individual capacity. The bill sets out copies of two several promissory notes each executed by Paschal M. Hulings, and each promising to pay Rachel R. Hulings the sum of $600 with interest. The notes were both made in the year 1892—the particular dates are of no significance. Paschal M. Hulings was the only son of Rachel R. Hulings. She is proven to have had several other children who were daughters. The substantial allegations of the bill are that Andrew B. Hulings and Elmer J. Hulings, the sons of Paschal, wrongfully obtained the possession of the two notes and destroyed them, and on various occasions, narrated in the bill, suppressed and concealed the fact that they had so destroyed them. The bill prays that the notes may be reinstated and re-established, and declared to be existing and valid obligations, and to be payable out of the estate of Paschal M. Hulings, or out of a portion of the estate of Rachel R. Hulings, his mother, which is in terms bequeathed to him, but which, by operation of the statute, has become payable to his descendants because he has predeceased his mother.

The answer of the defendants denies the alleged suppression and concealment of the receipts of these notes by Elmer B. and Andrew J. Hulings, and gives a narrative account of the mode in which the notes came into their possession. They allege that their grandmother, Mrs. Rachel R. Hulings, actually delivered the notes to them with instructions to destroy them; that coincidently with the delivery by her to them of the notes, they had undertaken to pay to her interest on the amount due on the notes during her life (by a written contract which is here produced in court), executed in the office of William Carter, a scrivener, in the presence of himself and his assistants, and they say that that is the explanation of the way in which the notes came into their possession. They deny the right of the complainant to any relief such as is prayed for in the bill. The

Lodge *v.* Hulings.

bill and answer contain several other allegations which do not touch upon the real question in dispute, which is the charge that the defendants wrongfully obtained the notes from Mrs. Hulings and destroyed them, and the prayer of her representative that those notes may be re-established and be given the same force and position for payment, as if they had remained in her possession at the time of her death. The charge of wrong-doing and the right to relief therefor are vigorously denied by defendants.

The complainant suggests a doubt whether Mrs. Hulings, on January 17th, 1895, was present at the office of her agent, Mr. Reeves, and subsequently on the same day at that of Mr. Carter, the scrivener, and whether she participated in the agreement set forth in the answer and here produced, by which the defendants undertook to pay to her interest during her life on $1,200, the amount of the two notes. There is no evidence on which to hinge such a doubt. The proof is affirmative on the part of Mr. Carter's assistant, who drew the agreement, that she was there. Mr. Carter's own testimony is not quite so positive, but casts no doubt upon the point. That of Elmer J. Hulings is clear and definite to show she was there. Mrs. Haines heard her say she wanted to go to Woodbury and that she went there as stated by Elmer. Mrs. Haines tells of her coming back and heard her express her satisfaction that the business was settled.

It is satisfactorily shown that Mrs. Hulings did, in fact, attend as stated, when the written agreement set forth in the answer was executed by Elmer and Andrew. The weight of the testimony also shows that coincidently with the delivery to her of the written agreement of Elmer and Andrew to pay her interest on the $1,200 during her life, she gave to them the two notes of $600 each and told them to destroy them, which they did.

This agreement was a personal undertaking by Andrew and Elmer Hulings, that in consideration that Mrs. Hulings, their grandmother, gave up her claim to the principal of the two notes, they would pay her interest on that principal sum during her life. The transaction was in form a contract, but was undoubtedly induced in part by the love and affection which the

11

old lady had for Paschal's boys. She had both a valuable and a "love and affection" consideration for concluding the business.

Having been fully executed by Mrs. Hulings in her lifetime, by her delivery of the notes, with directions to destroy them, followed by their destruction in accordance with her orders, it was a concluded transaction binding upon her administrator, if she had capacity to act and did act therein of her own free will.

On this point the complainant places the strain of his attack upon the transaction in question. He insists—*first,* that Mrs. Hulings was, in January, 1895, mentally incapacitated to make either a contract or a gift, and *secondly,* that she was induced to make this particular agreement by the exercise of an undue influence over her by her two grandsons, Elmer and Andrew, the defendants in this cause.

This claim involves an inquiry into the history of this old lady previous to and at the date of January, 1895. It appears that at the last-named date she was some seventy-odd years old—the exact age I do not think was stated. In 1878 she had suffered a paralytic stroke, which affected her left side, and subsequently to that time she had fallen down and had broken her left ankle, from which she was permanently lame in her left leg. She had also broken her left wrist, which had become stiffened, so that, while she could raise her hand to her head, she could not bend her arm at the wrist. All the testimony in the case shows that she was an illiterate woman. She could read print and she knew how to write her name in an imperfect way, but nothing more. If she could read writing at all, it was very uncertainly. So much so, that she was not willing to depend upon her own reading of a manuscript. She was never known to write anything but her name.

Testimony has been offered proving that she called upon other persons to do her writing for her, and this, it is contended, was because she was incapable of conducting business herself. The evidence does not tend to support this claim. What has been shown is, that whenever the business which Mrs. Hulings had in hand was of such a nature that it required written papers to be drawn, such as notes, receipts and the like, which she was unable to write, she called in her son-in-law, Mr. Ogden, or his daughter,

or her man of business, Mr. Reeves, to prepare the papers. But all the evidence as to these incidents shows that each of these parties acted simply as her amanuensis, preparing the written evidence of the transaction for her to sign. It plainly appears that the transactions themselves were initiated, conducted and determined by her, and that the party who did the writing simply obeyed her directions.

The most important transactions carried on by a person situated as Mrs. Hulings was, not engaged in any active business, are the spending of money for the usual and ordinary matters of daily life. These involve the frequent purchase of food for the household, clothing for herself, and all the many incidental expenditures which attend upon housekeeping. There is evidence proving, without denial by anybody, that this old lady, prior to and during the year 1895 (in the January of which she made the challenged agreement and surrendered the notes), conducted her own household and herself managed its daily business. She lived in one part of a house, in which she had a life estate, which she had arranged in such a manner that she could have her own private apartments. Her grandson Andrew B. Hulings lived in the other part. She evidently and naturally had an affectionate regard for him, but she did not live in any position of dependency. She had a servant of her own. She kept and managed her own household, bought her own store goods, paid her own store bills. Occasionally, when she went to Philadelphia, or elsewhere away from her home, she took someone with her, not to transact her business, for she evidently had her own individual views about that, but to aid and protect her because of her lameness and physical infirmities. All the hundreds of little transactions which attend upon daily living Mrs. Hulings conducted herself, without question on the part of anyone as to her mental capacity, certainly up to the fall of 1896. All of the witnesses called by both the complainant and defendants, either consciously or unconsciously, bore testimony to the fact that during these many years, prior to and at the time of the agreement, this old lady was capable of transacting, and did transact, her own business. The dressmaker, who was brought here to show that her mind was impaired, was asked, "Did she

Lodge *v.* Hulings.

give directions about the making of her dresses?" answered, "She did, and she had her own mind about it." Mr. Ogden, her son-in-law, is called to prove her incapacity in 1895, but his testimony showed that her lunacy attacked her at a period months after the challenged agreement had been made, and was manifested by indications which were so sharply defined that its first appearance was unmistakable. Mr. Ogden himself appears to have certified to Mrs. Hulings' capacity to transact business, at about the time in January, 1895, when the challenged transaction occurred, and after that time. He witnessed a large number of receipts and like papers (twenty or more), which she signed, she receiving the money and conducting the business, and he, by witnessing her signature, recognizing her capacity to give a discharge.

On another occasion Mrs. Hulings refused to endorse a note for one of her grandsons, Harry Fisler. Miss Ogden is brought to prove her incapacity, but her own relation of this matter shows a recognition of Mrs. Hulings' capability. Miss Ogden suggested that Mrs. Hulings, instead of endorsing the note, should buy some goods for the young man, who was about to marry. She did not suggest that she (Miss Ogden) should buy them, but that the grandmother (Mrs. Hulings) should do so. Mrs. Hulings accepted this advice, and herself bought the goods. If her grandmother had then been incapable of conducting business, the natural instinct on the part of this young lady—a very intelligent young woman—would have been to say, "Grandmother, I will buy these goods for you," but she did not say that. She made no suggestion which indicated a perception that her grandmother was in any way incapable.

All through the whole case it is quite evident that this old woman, feeble in physical condition, was mentally competent to conduct her own business, was well able to hold up her side of the business, and did so, until, as the witnesses describe it, she "began to see gypsies." Nobody in the family dealt with this old lady as having any mental incapacity until the time came when she began to have illusions. The first of these illusions was that she imagined that gypsies were fighting or chasing each other out in the yard. All the witnesses agree that until the appearing of

Lodge *v.* Hulings.

these hallucinations she conducted her own business affairs without any interference or intimation by anyone that she was in any way incapable. The period when these illusions first attacked Mrs. Hulings has been fixed by almost all the witnesses as in the summer or fall of the year 1897, which is more than two years after she had surrendered the notes and accepted the agreement to pay interest in their place, the transaction here in dispute. Even after these illusions appeared in 1897 Mrs. Hulings had intervals when her mind was clear of them. But she gradually became worse, and application was made and she was declared to be a lunatic on October 14th, 1898, and to have been a lunatic for a period of two years preceding—that is, from October 14th, 1896. The proofs here offered do not sustain the lunacy as existing at the last-named date. But taking the *de lunatico* return to be correct, it fixes the period of lunacy at a date one year and nine months after the delivery of the notes. When the evidences of the first appearance of lunacy are so sharply defined as in this case—the illusion as to gypsies—there is little difficulty in recognizing the date of its first appearance. When it appears, as I think it does, that this old lady was competent in January, 1895, it makes no difference, even if she were a raving maniac two years thereafter, because in January, 1895, the transaction on her part was completely executed.

Considering all the evidence, it is affirmatively proven that this old lady in January, 1895, when she accepted the agreement in question and surrendered the notes, was, mentally, entirely capable of conducting her own business.

· A very much more important phase of this case is the complainant's second contention, which has been pressed with great energy by the counsel of the complainant, which is that, conceding that in January, 1895, Mrs. Hulings was capable of entering into an agreement of this kind, yet the persons with whom she entered into it were placed to her in a fiduciary relation, and were obligated, by reason of that relation, so to deal with her that she was informed of all the reasonable and probable consequences of her act, and that in acting she had the opportunity for advice on the subject, and that she was in no way precluded, by anything which they did, from exercising a perfectly free judgment.

· Considering this branch of the case, the first point to be examined is the relationship of this lady to these young men to whom she surrendered these notes. They were her grandsons, the children of her deceased son, Paschal M. Hulings, the maker of the two surrendered notes. For some length of time, may be a year and a half prior to 1895, Mrs. Hulings had lived in the same house (but upon the peculiar arrangement, giving her a separate household, which I have mentioned), with the grandson Andrew B. Hulings. She had her own rooms, her own servant and her own side of the house. Andrew lived in the same house on the other side, and in other rooms. They exchanged family courtesies and privileges when either had special demand for additional room. They evidently lived upon kindly relations. Elmer J. Hulings, the other brother, lived a few hundred yards away.

In the pleadings in this case it appears that Mrs. Rachel R. Hulings, the person alleged to have been unduly influenced, had made her will in 1879. That will has been proved without dispute. It is under that will that the complainant in this suit is acting. By that will, as expressed on its face, she gives to her daughter, Mrs. Ogden, $3,000 and some trifling personal property; to her son, Paschal (the father of these two boys), she gives $3,000; then to Elmer J. (that is one of these defendants) she gives $100 when he comes to be twenty-one years old; to Andrew B. (that is the other) she gives $100 at the same period; to Emma M. Ogden, her granddaughter, she gives $100; to another daughter some household goods, and the rest of her estate she directs shall be divided between Harry Fisler (another grandson) and Mary Watson, with a limitation over in case of their death to her son Paschal and her daughter Mrs. Ogden.

That is a synopsis of Mrs. Hulings' will. It affords an idea of the sense of consideration which Mrs. Hulings, in the year 1879, and up to the time that she allowed that will to stand unrevoked, felt towards her children and her famliy. It gives the court unquestionable evidence of the esteem in which she held these members of her family and of the way in which she desired her estate to be divided among them. This condition of her mind, towards these children and grandchildren, remained

unchanged from 1879 to the 5th of October, 1886. Her son, Paschal, was at that time still living. Then she made a codicil and by that codicil she canceled the gift of $3,000 to Mrs. Ogden, who had died, and she gave instead of the $3,000, which she had given to Mrs. Ogden, $2,500 to Mrs. Ogden's daughter. She gave to Paschal, by the codicil, $350, in addition to the $3,000 which she had given to him in the will, and she also provided that the residuary estate which, in her will, she had limited over to Paschal and another, should now be limited over wholly to Paschal. That is a perfectly plain declaration by this old lady that she was disposed to give greater consideration to her son, Paschal, than to any of her descendants. It is undisputed evidence executed by herself and proven by the parties here in court as an accepted declaration of her purpose and disposition.

In 1893 Paschal M. Hulings died. About two years afterwards the transaction here challenged as having been unduly influenced by his sons, was arranged and executed by Mrs. Hulings. The proof is that Mrs. Hulings declared that she very much regretted that she had not done more for Paschal in his lifetime. That declaration was made after Paschal had died in 1893. After Paschal's death she changed her mode of living. She came to her grandson Andrew and proposed to him that he should come and live in rooms in the same house with her. That involved a change in Andrew's mode of living. He told her that he could not do that without he had some money to arrange the change, and that if she would go on his note he could arrange it, but otherwise not. She immediately said, "No, I do not go on notes." Here is another of the many indications of the disposition of this old lady to have her own way. She had a definite opinion of what she proposed to do. She had a mode of doing business. She did not endorse notes. It was only after she had been shown that her plan for the change could not be effected without she helped Andrew, that she consented to do it. Andrew then moved into the rooms in her house.

Her proven relations with Paschal's sons indicate that she had taken them into the preferential position which Paschal had in his lifetime occupied in her affections. It appears to have

been an entirely natural and reasonable thing that she should, in gratification of such an affection, have extended to the sons of Paschal the consideration which she regretted she had not shown him in his lifetime.

The particular transaction which is claimed to have been procured by the undue influence of Paschal's sons, is the surrender of the two notes by Mrs. Hulings to her grandsons, the defendants, Elmer J. and Andrew B. Hulings.

It may be said at the outset of the examination of this phase of the case, that there is no testimony whatever which proves that these young men, or either of them, in any way directly sought to induce their grandmother to make the arrangement which is here asserted to have been obtained by their undue influence. Nor is there any proof that their relation to her was such that she was in their care or under their control, or that she depended on them for advice, service or the conduct of her business. All that is shown is that she was old, was crippled physically, that she lived near to them and was upon terms of affectionate and kindly interest in them and that they went with her when she made the arrangement in question. The whole charge of the exertion of an undue influence is left upon inference.

It is contended that a presumption must arise because of the relations of the parties, that the young men were caretakers of their grandmother and that the burden of affirmatively proving that the notes were in fact surrendered by her without undue influence is thrown upon them.

On all the proofs there has been no showing of any such relation between the young men and their grandmother. She did not depend on them, she was quite able to manage her own affairs in January, 1895, and did actually manage them at that time. She had her business man of her own selection, Mr. Reeves. She used Mr. Ogden and his daughter for almost all of her writing needs. She was quite hard-headed and determined in having her own way. She had a keen sense of property, she scolded because taxes were high and prices did not suit her. The very transaction in question is a specimen of her independence. She first proposed going to see Mr. Reeves, her business

man, at Woodbury. Her grandsons did not know for what reason she wanted to go. She persisted for several days in her expressions of her wish that they should drive her to see Reeves. Mrs. Haines, a visitor in her house at the time, confirms this. They finally complied with her request and drove her to Reeves' office. She told him she did not want the principal of the notes, that all she wanted was the interest during her life, and asked Reeves, who had the notes, to give them up. He advised her to have a written agreement drawn and signed by the grandsons for the payment of the interest and sent her to Mr. Carter, a scrivener, for that purpose. She and the young men then went to Carter's office. He dictated the agreement set out in the answer. The young men both signed it. She gave them the notes, telling them to destroy them, which they did. She expressed her satisfaction when she came home. The grandsons afterwards paid the interest according to their agreement for several years, she receipting for it several times.

It will be noted that Mrs. Hulings herself initiated the steps looking to the arrangement now challenged. She went to her previously-selected adviser and business man, Mr. Reeves, who had served her for many years. The young men knew he had long been her trusted adviser. She opened the matter to him and he directed her to whom to go to have the written agreement drawn for the young men to sign. This written agreement was a valid instrument, binding upon the young men, securing her the payment of interest during her life. They do not appear to have suggested either the arrangement itself or the terms of the agreement. She subsequently enforced it by repeated collections of interest. She appears to have dominated the whole transaction from beginning to end.

These incidents repel the idea of the exertion of an undue influence upon her. If there had been a purpose to use such an influence, the young men, or one of them, would probably have persuaded Mrs. Hulings to give them the notes without any agreement. They would have dissuaded her from opening the matter to her long-trusted adviser, Mr. Reeves. They would have controlled the character of the agreement to pay interest which they signed so that its efficiency might have been impaired, and they

would have endeavored to suppress it, instead of paying interest according to its terms for years.

The weight of the evidence indicates that the old lady had in memory her fondness for her son, Paschal, and that she had not given him that preference in life that she had intended to give him, and recognized his boys as standing in his place. She desired to give them favorable consideration, and herself suggested and carried into effect the arrangement which is here claimed to have been induced by undue influence.

The testimony as to the relations of these young men to their grandmother and their conduct towards her neither indicates that they had any control whatever over her actions, nor that they attempted to obtain her property from her. If they had such control over her, and had a disposition to exercise it, they certainly would have managed to get into their possession the several hundred dollars of cash of which she died possessed, and would most probably have procured her to assign to them some of her mortgage securities. Nothing is exhibited of this kind. The case, as made, does not support the complainant's claims.

I will advise a decree dismissing the complainant's bill.

Whether such a decree should carry costs, in view of the fact that the bill is filed by an administrator *de bonis non cum testamento annexo,* prosecuting a claim for the recovery, as he alleges, of part of his testator's estate, is a matter on which I will hear counsel.